## CHAMBERS, *Appellant*, v. RINKEL.

**Suit to set aside Deeds for Fraud:** NOTICE: EVIDENCE. A father died, leaving his estate to his executor, with power of sale, the trust powers to cease in five years and the property to go to the sons. The trustee conveyed to one R. for $17,000. The property sold was heavily incumbered, a part of the debt being due to the trustee, who was pressing for payment. R. borrowed on the property $20,000 from a bank, and with this money paid $13,000 of the incumbrances. A judgment creditor of the sons began this proceeding to set aside the conveyance to R. and the mortgage to the bank, on the ground of a conspiracy on the part of the sons, the trustee and executor, the bank and R., to defraud the creditors of the sons. *Held*, that in the absence of any evidence of any notice to the bank of a fraudulent intent, the mortgage could not be set aside ; that the fact that the property, at the time of the mortgage, is valued by witnesses, at $17,000, and was sold at that price, is no evidence that the bank was a party to a fraud. The bank may have relied upon the credit of the mortgageor, and looked for a rise in property during the currency of a long loan. *Held*, further, that the facts stated constituted no evidence of a conspiracy to defraud on the part of the trustee, the sons and the purchaser. There is no evidence that the property could have been sold so as to pay the debts and raise a large surplus. The property, on the testimony, could only be sold at a price far below its nominal value, and was only sold after ineffectual attempts to dispose of it to better advantage. Testimony that the purchaser, who was a relative of the sons, some weeks after the sale, agreed to reconvey the property to the sons on being re-imbursed—it appearing that there was no understanding at the date of the sale that he was to hold the property for another, and in the total absence of any evidence of an intention to defraud on the part of the sons, or of knowledge of such intention on the part of the purchaser—has no tendency to sustain the gist of the bill.*

*Appeal from St. Louis Court of Appeals.*

AFFIRMED.

On the 8th day of May, 1868, Adolph Renard, Sr., died, seized, among other property, of a certain tract of

---

*This abstract of the opinion of the St. Louis court of appeals is taken from 8 Mo. App. 559.

land in St. Louis county. By his will, which was duly probated, he named Eugene Jaccard, George Rinkel and August Guye his executors, and devised his whole estate to Jaccard and Guye as trustees, with power to lease, sell, convey or otherwise dispose of the estate or any part of it upon such terms and as fully as if they owned the fee; but the proceeds were to remain subject to the same uses and trusts, and at the end of five years from testator's death the trust property was to go to his two sons, Adolph and Charles. Jaccard died and Rinkel declined to act. Guye alone administered. On the 6th day of May, 1873, Guye executed a conveyance of the aforesaid tract to Rinkel for the expressed consideration of $17,000. On the same day Rinkel borrowed of the Real Estate Savings Institution $20,000, for which he gave his notes and to secure their payment executed a deed of trust on the land. At this time Adolph and Charles Renard were indebted to sundry persons, among others to the Butchers & Drovers' Bank, who had obtained judgment against them for $900. In 1874 execution was issued on this judgment, and on the 23rd day of April, 1874, the said tract of land was sold thereunaer to Chambers, who immediately brought this suit, alleging that the conveyance by Guye to Rinkel was made in fraud of the creditors of the Renards and upon an understanding that Rinkel should hold the property in secret trust for them, and further alleging that the Real Estate Savings Institution accepted the deed of trust with full notice of the fraud, and praying that both the deed and the deed of trust be set aside and the title be vested in plaintiff. All the persons named, together with John M. Krum, the trustee in the deed of trust, were made parties defendant. The Renards suffered judgment by default. Rinkel and Guye answered denying the alleged fraud. The Real Estate Savings Institution and Krum answered, denying that there was any fraud, and denying any knowledge on their part of any fraud. The following is an abstract of the testimony on this issue:

Charles Renard for plaintiff: Am familiar with the property. At the time of its sale, it was worth $150 an acre, and there were 293 or 295 acres in it. About 5th May, 1873, I first learned of its sale to Rinkel. He is my brother's brother-in-law. Out of the $17,000, had to take up a deed of trust, and to pay to Mr. Guye, the executor, for advances, the sum of $4,277.22. The history is this: Guye, the executor, said that it was so near the end of the trust he had to do something to close it; must make some arrangements, and we must obtain some offer for it. He proposed that Mr. Haeussler, his counsel, should buy it, assuming the debts upon it, and in addition, by way of exchange, giving to us a warehouse on Main and Elm streets. We declined it. Through Guye another offer was made by John L. Ferguson, who proposed to assume the incumbrances due, in addition cede to us 400 acres on the river with ferry boat and privilege; this was three weeks or a month previous to the Rinkel sale, and would likely have been accepted by us, but that as to a part of the land the title was defective. Before the sale to Rinkel, it was mooted that the money due to the executor should be paid by a loan on the property. I told my brother two or three times that as there was a trust reposed in Rinkel, I did not like to see all of our property pass out of our hands without a bond; and one was given by Rinkel for the faithful performance of the trust. Brother and myself were then both of age, and living in this county. But we were then owing notes, some of which were held by the Butchers & Drovers' Bank, others by Rinkel as indorser. And, as the bank was pressing us, and my brother, as he said, did not wish to see it all sacrificed, I reluctantly consented to have it turned over to Rinkel. I could have squared up everything without these transfers. But the long and the short of it was, that it was placed in Rinkel's hands to shelter it from these notes. The debts then were upon the land, $12,666; to the executor about $4,300: and of individual debts, about $7,000. The deed to Rinkel in-

stead of to ourselves was made partly to shield us from our creditors and partly because Mr. Guye had written to me that he had already deeded it to his clerk Dieckmann, saying, that it should be transferred to a third party. It was done to give us time to settle without being shoved. I don't know if my brother had any defense to Butchers & Drovers' debt; I know I didn't. Guye gave us till 8th of May to settle it, which was within the term of the trust to find a purchaser. If then we had not succeeded, Dieckmann was to have it; I never saw the deed to him, but Guye wrote me to this effect; I do not know that when Rinkel bought this property of Guye he refused to have any understanding with me or my brother, or that he would not hold it in trust for us. Nor was it my understanding with my brother that he would not hold it in trust for us; but was willing to give us a bond to make a deed to both of us whenever we paid to him a certain sum of money. The bond was all the written agreement between us, and I never read it till to-day; it was in my brother's hands and I presumed it was all right. My understanding was, that this deed to Rinkel was to convey it from our creditors. It was on these conditions that Rinkel accepted of the deed from Guye, to save the property from sacrifice. My brother was spokesman; he managed the whole transaction, and I never spoke to Rinkel about it. I don't say that Rinkel bought knowing that we intended to defraud our creditors, but I know it was talked of between ourselves, and that my brother managed the whole thing with Rinkel. We could ourselves have bought it on the same terms as Rinkel. I never heard that he was to obtain the loan from Real Estate Savings, on condition that he should have the absolute property of it. In the loan of $20,000 there was a surplus of $3,100 on which we drew for all our small debts, and which we could use till we could sell the property. After his purchase of it, I went on the place, and did not hold it from him, but used it as my own —paid no rent, collected the rents but never paid Rinkel.

any part of them. When I say that it was placed in Rinkel's hands to shelter it from our creditors, I mean, to give us time to pay. It was to cover up the tracks to give us time to pay the notes; that was all. Of the loan of $20,000 there was a surplus of $3,100, which was paid to Rinkel, and for which I would draw as I wanted it; kept no account of it, but would go to him when in need; don't know how much my brother drew. It was recognized as belonging to us. Anybody could have purchased as Rinkel did.

Adolph Renard, for defense, testified: Guye had written to us that he would turn over the property to Dieckmann, his bookkeeper, and it was after this that I first called upon Rinkel with the offer that he should buy the property. I had had nothing to do with the purchase of it, and he was very averse to having anything to do with it; I went with my brother to Rinkel. He was to buy it, and when we would re-imburse him for all it had cost him, we were to have it back. Hence, I took this bond from him.

The bond was then read. It was signed by Rinkel, dated May, 1873, in the penal sum of $35,000, to Charles and Adolph Renard—conditioned for the conveyance to them of the realty in suit upon the payment of the notes given by him to the Real Estate Savings Institution.

This bond is the only agreement, and it was not mentioned at the time of the purchase and was drawn up sometime after. Before this bond Rinkel had paid to me none of the money received from the Real Estate Savings, and I don't know if he had to my brother. Before this bond I knew of no agreement with Rinkel; he held the property, not in trust for us.

On cross-examination: When he bought, there was no agreement. I was then twenty-nine years of age. My brother thirty-one. I don't swear that Rinkel paid my brother no money. I asked Rinkel for this bond and he gave it. My brother's reason was that he was afraid that

the property would pass out of his hands. The sale to Rinkel was absolute. I repeat, there was no agreement till after the deed. My brother told me he did not feel safe to see all of his property pass out of his hands without such an obligation. Rinkel bought it absolutely for himself. My debts then were $2,600. What my brother's were I can't say, except of our joint indebtedness, and which was about $2,500. I do not know that I ever got any of this $2,500 surplus received from the Real Estate Savings. I was in business with him in my own name. The firm was in Rinkel's name and no sign showed that I had an interest in it, nor did I let it be known to my creditors.

Daniel G. Taylor for defense: Was president of the Real Estate Savings Institution when this loan was made; never heard of this bond until to-day; never heard of a trust between Rinkel and the Renards—or until to-day of the transaction testified to by Charles Renard. The $20,000 was all paid, save a prior incumbrance to Hitchcock, and some by the cashier to Guye. The loan was made only after our attorney said it was correct. The loan was made perhaps a day or two after the deed to Rinkel was recorded. The examination of the title was made by our counselor, who was then John M. Krum, and upon his certificate as to the abstract of title he had ordered. We generally loaned to the extent of one-half or two-thirds of the value of the property.

John M. Krum for defense: I never knew of this bond till lately; heard most of Charles Renard's evidence. I never till to-day heard of this trust in Rinkel for Renard. I do not now remember if the abstract was by Williams or by McClellan. My habit was to verify the abstract by reading the deeds to see if there was anything peculiar in them, but I don't remember if I did so in this instance; think I did; had no conversation with Guye, the Renards or Rinkel about it; knew nothing of any judgment in favor of the Butchers & Drovers' Bank against the Renards.

On cross-examination : The abstract was the only one furnished me. In it there is a judgment in favor of Butchers & Drovers' Bank, 21st February, 1872, for $900. Whatever was in that abstract of course I knew.

August Guye for defense : As the executor of Renard I received all the consideration mentioned in my deed to Rinkel, $12,500, by return to me of my note, which was a loan on the property, and a check for $4,500. The deed to Rinkel was as agent of Charles and Adolph Renard, because I wished to get rid of the whole affair. I told them I would deed the property to anybody they chose, on being repaid. They told me to do so to Rinkel, and wanted to enter into particulars, but I declined to hear these, as I did not wish to know them. Before sale to Rinkel I had no conversation with him.

On cross-examination : Previous to that to Rinkel I had made a deed to Dieckmann, my clerk. It was never acknowledged. It was intended only to pass title.

George Rinkel for defense : I bought this property at tainsnce of the Renards. When I purchased I had no understanding with Charles or Adolph Renard to hold this property in trust for them. Two or three weeks after the purchase I made this bond, because I did not wish to make anything out of them; but previous to the purchase had no understanding by which they could claim a return of the property. Charles' evidence is not true, that the transfer to me was to shelter it from their creditors. They never expressed to me any such intention. Before I bought I did learn from Renard that if they did not get a purchaser the property would be lost to them. This shortly before the transfer.

On cross-examination : I told them I wished to make nothing out of them. This abstract by McClellan I got for Bennett; it is the one on which the Real Estate Savings Institution made the loan. After it was made I gave it to Real Estate Savings Institution, and later got it from Judge Krum to give to Bennett, who spoke of buying. Adolph,

my brother-in-law, was in business with me. I gave to him a third of my profits for his salary. The business was in name of George Rinkel, not Rinkel & Co. I don't know why the property could not have been taken by them as well as by me. Getting the deed from Guye and paying the money was one transaction.

The court found for the defendants and gave judgment accordingly. Plaintiff appealed to the St. Louis court of appeals, where the judgment was affirmed, and thence to this court.

SHERWOOD, J.—This is a proceeding in equity to set aside a certain conveyance on the ground of fraud, the plaintiff claiming under a sheriff's deed. We have examined this matter, and as the result of our examination fully concur in opinion with the trial court and the court of appeals, and consequently affirm the judgment.